Robert C. Moest, Of Counsel, SBN 62166
**THE BROWN LAW FIRM, P.C.**
2530 Wilshire Boulevard, Second Floor
Santa Monica, CA 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

ALAN MOISIO, derivatively on behalf of SNAP INC.,

          Plaintiff,

      v.

EVAN T. SPIEGEL, DEREK ANDERSEN, KELLY COFFEY, JOANNA COLES, LIZ JENKINS, JIM LANZONE, MICHAEL LYNTON, SCOTT D. MILLER, ROBERT MURPHY, PATRICK SPENCE, POPPY THORPE, and FIDEL VARGAS,

          Defendants,

     and

SNAP INC.,

          Nominal Defendant.

Case No.:

**DEMAND FOR JURY TRIAL**

**<u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>**

## <u>INTRODUCTION</u>

Verified Shareholder Derivative Complaint

Case 2:25-cv-08275-FLA-BFM    Document 1    Filed 09/02/25    Page 2 of 57    Page ID #:2

Plaintiff Alan Moisio ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of nominal defendant Snap Inc. ("Snap" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants Evan T. Spiegel ("Spiegel"), Derek Andersen ("Andersen"), Kelly Coffey ("Coffey"), Joanna Coles ("Coles"), Liz Jenkins ("Jenkins"), Jim Lanzone ("Lanzone"), Michael Lynton ("Lynton"), Scott D. Miller ("Miller"), Robert Murphy ("Murphy"), Patrick Spence ("Spence"), Poppy Thorpe ("Thorpe"), and Fidel Vargas ("Vargas") (collectively, the "Individual Defendants," and together with Snap, "Defendants") for breaches of their fiduciary duties as controlling shareholders, directors, and/or officers of Snap, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and for contribution under sections 10(b) and 21D of the Exchange Act against Defendants Spiegel and Andersen. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Snap, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from April 29, 2025, and August 5, 2025, inclusive (the "Relevant Period").

2.      Snap operates the visual messaging platform called Snapchat, which

Verified Shareholder Derivative Complaint

"empowers people to express themselves, live in the moment, learn about the world, and have fun together. It's the easiest and fastest way to communicate the full range of human emotions with your friends without pressure to be popular, pretty, or perfect."[1]

3.      The Snapchat platform connects brand and direct response advertisers to customers in a variety of ways including different ad types, integrations, and locations. Advertisers participate in a dynamic, real-time auction system in order to provide advertisements to customers on Snapchat. Snapchat's advertisement auction system utilizes "Goal-Based Bidding" in order to conduct its auctions. Goal-Based Bidding lets the advertiser tell Snap what its goals are, such as app installs, website visits, or video views, and Snapchat's advertisement auction system then optimizes the advertiser's bids within the auction system to meet the advertiser's stated goals.

4.      The Relevant Period began on April 29, 2025, when, after the markets closed, the Company held an earnings call discussing its first quarter results for 2025 (the "1Q 2025 Earnings Call"). During the 1Q 2025 Earnings Call, Defendant Andersen broadly provided guidance for the upcoming quarter, stating in relevant part:

> Given the uncertainty with respect to how macroeconomic conditions may evolve in the months ahead, and how this may impact advertising demand more broadly, we do not intend to share formal financial guidance for Q2. ***While our top line revenue has continued to grow, we have experienced headwinds to start the current quarter, and we believe it is prudent to continue to balance our level of investment with realized revenue growth.*** As a result, we are updating our full year cost structure guidance to reflect our current investment plans.
>
> . . .
>
> ***While there is uncertainty regarding the macro operating environment, we remain optimistic about the long-term prospects for our business.*** We remain optimistic because of the progress we have made with our ad platform to improve performance for our advertising partners, because of the progress we have made to diversify our advertiser base as well as our revenue sources

---

[1] https://investor.snap.com/about-snap/default.aspx

Verified Shareholder Derivative Complaint

with the growth of Snapchat+. ***Because of our demonstrated ability to prioritize our cost structure to balance investment with top line growth over time***, and because we have built a strong balance sheet with the financial flexibility necessary to maintain strategic focus through volatile macro conditions.

Moving forward, we will remain focused on executing against our strategic priorities of growing our community and improving depth of engagement, driving top line revenue growth and diversifying our revenue sources, and building toward our long-term vision for augmented reality.[2]

5.      Throughout the Relevant Period, the Individual Defendants consistently issued or caused the Company to issue these positive statements pertaining to Snap's expected advertising revenue and growth while emphasizing potential macroeconomic instability. Yet in reality, Snap's own execution error in its ad auction system caused Snap's advertising growth rate to decline significantly, from 9% in the first quarter of 2025 to only 1% in April 2025.

6.      The truth emerged on August 5, 2025, when the Company held an earnings call discussing its second quarter results for 2025 (the "2Q 2025 Earnings Call"). On the 2Q 2025 Earnings Call, Defendant Andersen revealed the top line growth was affected by an issue with Snap's ad auction system, in relevant part stating,

Our rate of top line growth was impacted by a number of factors in Q2, including an issue related to our ad platform, the timing of Ramadan and the effects of the de minimis changes. ***Unfortunately, in our efforts to improve advertiser performance, we shipped a change that caused some campaigns to clear the auction at substantially reduced prices***. We have since reverted this change and advertising revenue growth has improved as advertisers adjust their bid strategies to achieve their objectives.

7.      On this news, the Company's stock price fell $1.61 per share, or approximately 17.2%, from a closing price of $9.38 per share on August 5, 2025, to close

---

[2] All emphasis has been added unless otherwise noted.

4

Verified Shareholder Derivative Complaint

at $7.78 per share on August 6, 2025.

8. During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) Snap's optimistic reports of its advertising growth rate and earnings potential relied too heavily on its ability to execute on its potential; (2) Snap was already experiencing the effect of the execution error in its auction bidding advertisement system when the Defendants' claimed a lack of visibility due to macroeconomic conditions; and (3) as a result, the Company's growth rate and earnings potential would fall short of the projected guidance. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

9. The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

10. In addition, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing Snap to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations. Indeed, between April 2025 and August 2025, approximately 4 million shares of Snap common stock were repurchased at artificially inflated prices, costing the Company approximately $33.3 million As the Company's stock was actually worth only $7.78 per share, the price at which it was trading when markets closed on August 6, 2025, the Company overpaid for repurchases of its own stock by over $2 million in total.

11. Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain adequate internal controls

Verified Shareholder Derivative Complaint

while Defendant Andersen engaged in improper insider sales, netting total proceeds of ***approximately $2.7 million***.

12. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

13. In light of the Individual Defendants' misconduct—which has subjected the Company its co-founder and Chief Executive Officer ("CEO"), and its Chief Financial Officer ("CFO") to a federal securities fraud class action lawsuits pending in the United States District Court for the Central District of California (the "Securities Class Actions"), which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

14. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

15. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of Defendant Spiegel's and Defendant Andersen's liability in the Securities Class Actions, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

16. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. §

Verified Shareholder Derivative Complaint

240.10b-5) promulgated thereunder, and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

17. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

18. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

19. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, Defendants have conducted business in this District, Defendants' actions have had an effect in this District, and Snap is headquartered in this District.

## PARTIES

### Plaintiff

20. Plaintiff is a current shareholder of Snap. Plaintiff has continuously held Snap common stock at all relevant times.

### Nominal Defendant Snap

21. Snap is a Delaware corporation with principal executive offices at 3000 31st Street, Santa Monica, California 90405. Snap's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "SNAP."

### Defendant Spiegel

22. Defendant Spiegel co-founded the Company and has served as the Company's CEO and a director since May 2012. According to the Form 10-K filed for the 2024 Fiscal Year filed on February 5, 2025 (the 2024 Form 10-K), as of December 31, 2024, Defendant Spiegel owned 39,063,540 shares of Class A common stock, 5,862,410 shares of Class B common stock, and 123,683,019 shares of Class C common stock, which gives Defendant

Verified Shareholder Derivative Complaint

Spiegel 53.1% of the total voting power in the Company. The 2024 Form 10-K states the following about the Company's voting structure:

> Class A common stockholders have no voting rights, unless required by Delaware law. As a result, all matters submitted to stockholders will be decided by the vote of holders of Class B common stock and Class C common stock. As of December 31, 2024, Mr. Spiegel and Mr. Murphy control over 99% of the voting power of our capital stock, and Mr. Spiegel alone may exercise voting control over our outstanding capital stock. Mr. Spiegel and Mr. Murphy voting together, or in many instances, Mr. Spiegel acting alone, will have control over all matters submitted to our stockholders for approval.

Thus, Defendant Spiegel is a controlling shareholder.

23.    The Leadership page of the Company's website[3] stated the following about Defendant Spiegel:

> Mr. Spiegel is our co-founder and has served as our Chief Executive Officer and a member of our board of directors since May 2012. Mr. Spiegel holds a B.S. in Engineering – Product Design from Stanford University. Mr. Spiegel has served on the board of directors of KKR & Co., Inc. since October 2021.

**Defendant Andersen**

24.    Defendant Andersen has served as the Company's CFO since May 2019. Defendant Andersen previously served as Snap's Vice President of Finance from July 2018 until May 2019.

25.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Andersen made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/ Share ($) | Proceeds ($) |
|---|---|---|---|
| May 14, 2025 | 208,525 | $9.80 | $1,882,772 |

---

[3] https://investor.snap.com/governance/leadership-team/default.aspx

8

Verified Shareholder Derivative Complaint

| May 16, 2025 | 61,068 | $8.60 | $524,940 |
| June 16, 2025 | 33,886 | $8.04 | $272,443 |

Thus, in total, before the fraud was exposed, Defendant Andersen sold 303,479 shares of Company stock on inside information, for which he received approximately $2.7 million in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

26.     The Leadership page of the Company's website stated the following about Defendant Andersen:

> Mr. Andersen has served as Chief Financial Officer since May 2019 and previously served as our Vice President of Finance since July 2018. Mr. Andersen was previously employed at Amazon.com, Inc. from March 2011 to June 2018, serving in a variety of roles, most recently as Vice President of Finance supporting Amazon's digital video business. Mr. Andersen also previously served in roles at Fox Interactive Media, including as Senior Vice President, Finance and Business Operations for IGN, and as Vice President, Finance. Mr. Andersen holds a B.B.A from Acadia University, an M.B.A from the Haas School of Business at the University of California, Berkeley, and is a CFA Charter Holder.

**Defendant Coffey**

27.     Defendant Coffey has served as a Company director since May 2020. She also serves as a member of the Audit Committee.

28.     The Board of Directors page of the Company's website[4] stated the following about Defendant Coffey:

> Ms. Coffey has served on our board of directors since May 2020. Ms. Coffey is a co-founder of Verita Strategic Wealth Partners, LLC. Ms. Coffey served as Chief Executive Officer at City National Entertainment, a unit of City National Bank, from November 2023 to February 2025. Ms. Coffey served as Chief Executive Officer of City National Bank, a subsidiary of the Royal Bank

---

[4] https://investor.snap.com/governance/Board-of-Directors/default.aspx

Verified Shareholder Derivative Complaint

of Canada (RBC), from February 2019 to November 2023. Prior to joining City National Bank, Ms. Coffey served in various leadership positions with J.P. Morgan from 1989 to January 2019, most recently serving as the Chief Executive Officer of J.P. Morgan's U.S. Private Bank. Ms. Coffey holds an M.S. in Foreign Service from Georgetown University and a B.A. in International Affairs & French from Lafayette College.

**Defendant Coles**

29. Defendant Coles has served as a Company director since December 2015. She is also the Chair of the Nominating and Corporate Governance Committee.

30. The Board of Directors page of the Company's website stated the following about Defendant Coles:

Ms. Coles has served on our board of directors since December 2015. Ms. Coles has served as Creative and Content Officer at The Daily Beast since April 2024. Previously, Ms. Coles served as chairperson and Chief Executive Officer of Northern Star Acquisition Corp. from July 2020 until its merger with Bark, Inc. in June 2021, Chief Content Officer of Hearst Magazines from September 2016 to August 2018, overseeing editorial for Hearst's 300 titles globally, and as Editor-in-Chief of Cosmopolitan from September 2012 to September 2016. She edited Marie Claire magazine from April 2006 to September 2012. Ms. Coles worked for The Times of London from September 1998 to September 2001 and served as New York Bureau Chief for The Guardian from 1997 to 1998. She currently serves on the board of directors of Sonos, Inc. Previously, Ms. Coles served as a director of Bark Inc., Northern Star Investment Corp. II, Northern Star Investment Corp. III, Northern Star Investment Corp. IV, and the Fallen Journalist Memorial Fund. Ms. Coles holds a B.A. in English and American literature from the University of East Anglia.

**Defendant Jenkins**

31. Defendant Jenkins has served as a Company director since December 2020. She also serves as the Chair of the Audit Committee.

32. The Board of Directors page of the Company's website stated the following about Defendant Jenkins:

10

Verified Shareholder Derivative Complaint

Ms. Jenkins has served on our board of directors since December 2020. Ms. Jenkins has served as Chief Business Officer at NBCUniversal Entertainment and Studios Group since September 2023. Ms. Jenkins served as Chief Operating Officer at Be Sunshine, LLC (Hello Sunshine) from January 2021 to September 2023, and served as Chief Financial Officer at Hello Sunshine from August 2018 to December 2020. Prior to joining Hello Sunshine, Ms. Jenkins worked at Sony Interactive Entertainment as the Head of Strategic Ventures for PlayStation from June 2017 to August 2018, the Creative Cartel as interim Co-Chief Executive Officer from October 2015 to June 2016, and Media Rights Capital from October 2008 to May 2015, most recently serving as Senior Vice President of Corporate Development and Strategy. She currently serves as Chair of the board of GLAAD. Ms. Jenkins holds an M.B.A. from The Wharton School at the University of Pennsylvania and a B.A. in Economics from Stanford University.

**Defendant Lanzone**

33.   Defendant Lanzone has served as a Company director since September 2024. He also serves as a member of the Nominating and Corporate Governance Committee.

34.   The Board of Directors page of the Company's website stated the following about Defendant Lanzone:

Mr. Lanzone has served on our board of directors since September 2024. Mr. Lanzone has served as the Chief Executive Officer and member of the board of directors of Yahoo Inc. since September 2021. Prior to joining Yahoo Inc., Mr. Lanzone served as Chief Executive Officer of Tinder, a geosocial networking and online dating application, from July 2020 to September 2021, as Executive-in-Residence at venture capital firm Benchmark Capital from January 2020 to July 2020, as Chief Digital Officer of CBS Corporation from January 2016 to December 2019, and as President and Chief Executive Officer of CBS Interactive, a division of CBS Corporation, from March 2011 to December 2019. From January 2009 to March 2011, he was the founder and Chief Executive Officer of Clicker Media, Inc., an internet video search engine and navigation guide, which was acquired by CBS Corporation in 2011. Mr. Lanzone served on the board of directors of GoPro, Inc., a technology company, from 2018 to 2023, Edmunds.com Inc. from 2014 to 2020, Supernova Partners Acquisition Company, Inc. from October 2020 to September 2021, Supernova Partners Acquisition Company II, Ltd. from March 2021 to March 2022, Supernova Partners Acquisition Company III,

Verified Shareholder Derivative Complaint

Ltd. from March 2021 to March 2023, and Coliseum Acquisition Corp. from June 2021 to June 2023. Mr. Lanzone holds a JD/MBA from Emory University, and a BA from the University of California, Los Angeles.

**Defendant Lynton**

35.    Defendant Lynton has served as a Company director since April 2013 and Chairperson of the Board since September 2016. He also serves as the Chair of the Compensation Committee, a member of the Audit Committee, and as a member of the Nominating and Corporate Governance Committee.

36.    The Board of Directors page of the Company's website stated the following about Defendant Lynton:

> Mr. Lynton has served on our board of directors since April 2013 and has been Chairperson of our board of directors since September 2016. Mr. Lynton served as Chief Executive Officer or Co-Chief Executive Officer of Sony Entertainment Inc., an international entertainment company, from April 2012 until August 2017, as Chairman and Chief Executive Officer of Sony Pictures Entertainment Inc. from January 2004 until May 2017, and as CEO of Sony Corporation of America from March 2012 to August 2017. Mr. Lynton currently serves as a member of the board of directors of Ares Management Corp., Warner Music Group Corp., and Schrodinger, Inc. Previously, Mr. Lynton served as a member of the board of directors of Pandora Media, Inc., Pearson plc, and The Boston Beer Company. Mr. Lynton holds a B.A. in History and Literature from Harvard College and an M.B.A. from Harvard Business School.

**Defendant Miller**

37.    Defendant Miller has served as a Company director since October 2016. He also serves as a member of the Audit Committee and as a member of the Compensation Committee.

38.    The Board of Directors page of the Company's website stated the following about Defendant Miller:

> Mr. Miller has served on our board of directors since October 2016. Mr. Miller

12

Verified Shareholder Derivative Complaint

is a founder and Chief Executive Officer of Council Advisors (formerly known as G100 Companies), and is also a founder and chairman of G100 Network and SSA & Company. Before joining Council Advisors in March 2004, Mr. Miller was employed at Hyatt Hotels Corporation, a global hospitality company, where he served as non-executive vice chairman from August 2003 to December 2004, president from January 1999 to August 2003, and executive vice president from September 1997 to July 2003. Mr. Miller served on the boards of QTS Realty Trust, Inc. from 2013 to 2021, Affinion Group, Inc. from 2011 to 2013, AXA Equitable Life Insurance Company from 2002 to 2012, Orbitz Worldwide, Inc. from 2003 to 2004, and NAVTEQ corporation from 2002 to 2006. He also serves on several private company boards. Mr. Miller holds a B.S. in Human Biology from Stanford University and an M.B.A. from the University of Chicago.

**Defendant Murphy**

39.     Defendant Murphy cofounded the Company and has served as Snap's Chief Technology Officer ("CTO") since May 2012. According to the 2024 Form 10-K, as of December 31, 2024, Defendant Murphy owned 67,170,682 shares of Class A common stock, 5,862,140 shares of Class B common stock, and 107,943,924 shares of Class C common stock, which gives Defendant Murphy 46.4% of the voting power in the Company. Thus, Defendant Murphy is a controlling shareholder of the Company.

40.     The Leadership page of the Company's website stated the following about Defendant Murphy:

> Mr. Murphy is our co-founder and has served as our Chief Technology Officer and a member of our board of directors since May 2012. Mr. Murphy holds a B.S. in Mathematical and Computational Science from Stanford University.

**Defendant Spence**

41.     Defendant Spence has served as a Company director since September 2023. He also serves as a member of the Compensation Committee.

42.     The Board of Directors page of the Company's website stated the following about Defendant Spence:

13

Verified Shareholder Derivative Complaint

Mr. Spence has served on our board of directors since September 2023. Mr. Spence currently serves as Chairperson of the board of the Canadian Shield Institute. Mr. Spence previously served as Chief Executive Officer and member of the board of directors of Sonos, Inc. from January 2017 to January 2025. Prior to joining Sonos, Mr. Spence spent 14 years at Research In Motion Limited, a consumer electronics company and the developer of the BlackBerry device, in a variety of senior roles, including most recently as the Senior Vice President and Managing Director of Global Sales and Regional Marketing. Mr. Spence holds a B.A. in business administration from the Ivey Business School at the University of Western Ontario.

**Defendant Thorpe**

43.    Defendant Thorpe has served as a Company director since August 2018. She also serves as a member of the Audit Committee and as a member of the Compensation Committee.

44.    The Board of Directors page of the Company's website stated the following about Defendant Thorpe:

Ms. Thorpe has served on our board of directors since August 2018. Ms. Thorpe is a CEO of a marketing and strategy consultancy. Previously, Ms. Thorpe served as Chief Marketing Officer at Sesame Inc. from March 2020 to May 2021, Head of Brand Marketing at Glossier Inc., a beauty brand, from April 2018 to February 2020, Head of Strategy at FNDR, a marketing and advertising agency, from August 2017 to April 2018, and Strategy Director at R/GA, a digital agency, from August 2014 to August 2017. Ms. Thorpe holds a B.A. in English and Film Studies from University of San Francisco.

**Defendant Vargas**

45.    Defendant Vargas has served as a Company director since July 2021. He also serves as a member of the Nominating and Corporate Governance Committee.

46.    The Board of Directors page of the Company's website stated the following about Defendant Vargas:

Mr. Vargas has served on our board of directors since July 2021. Mr. Vargas has served as Chief Executive Officer of HSF since January 2013. Prior to

14

Verified Shareholder Derivative Complaint

joining HSF, Mr. Vargas worked as a Partner at Centinela Capital Partners from June 2006 to December 2012, and from 1992 to 1997, Mr. Vargas served as Mayor for the City of Baldwin Park, California. Mr. Vargas has served on Presidential Commissions for Presidents Clinton, Bush, Obama, and Biden. Mr. Vargas holds an M.B.A. and an A.B. in Social Studies from Harvard University.

## **FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

47.     By reason of their positions as controlling shareholders, officers, directors, and/or fiduciaries of Snap and because of their ability to control the business and corporate affairs of Snap, the Individual Defendants owed Snap and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Snap in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Snap and its shareholders so as to benefit all shareholders equally.

48.     Each controlling shareholder, director, and officer of the Company owes to Snap and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

49.     The Individual Defendants, because of their positions of control and authority as controlling shareholders, directors, and/or officers of Snap, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

50.     To discharge their duties, the controlling shareholders, officers, and directors of Snap were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

51.     Each Individual Defendant, by virtue of their position as a controlling shareholder, director, and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and

preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as controlling shareholders, directors, and officers of Snap, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also the controlling shareholders, officers, and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised the Company's Board at all relevant times.

52.    As controlling shareholders, senior executive officers, and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

53.    To discharge their duties, the controlling shareholders, officers, and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the controlling shareholders, officers, and directors of Snap were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent

16

Verified Shareholder Derivative Complaint

manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to Snap's corporate governance and applicable business practice standards;

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Snap conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Snap and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Snap's operations would comply with all applicable laws and Snap's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

Verified Shareholder Derivative Complaint

54.    Each of the Individual Defendants further owed to Snap and its shareholders the duty of loyalty requiring that each favor Snap's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

55.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Snap and were at all times acting within the course and scope of such agency.

56.    Because of their advisory, executive, managerial, directorial, and controlling positions with Snap, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

57.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Snap.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

58.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

59.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

60.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Snap was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

61.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

62.     At all relevant times hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Snap and was at all times acting within the course and scope of such agency.

### SNAP'S CODE OF CONDUCT

63.     In the section of Snap's Global Code of Conduct (the "Code of Conduct") "Being Kind Is a Shared Responsibility", the Code of Conduct states,

> So who has the responsibility to be kind? Everyone who works for Snap, from team members to interns to officers and directors. This Code may also apply to individuals and entities working on our behalf, like suppliers, contractors, consultants, agents, and other partners. It's part of our jobs to know how to make good decisions that reflect courage, empathy, and trust, and follow the principles in this Code.

Verified Shareholder Derivative Complaint

64.    In the section, "The Role of Our Leaders," under the subsection called "What to Do When Someone Raises a Concern:" the Code of Conduct states, in relevant part:

Directors, officers, and Integrity & Compliance executives bear special responsibility for following this Code. In the event of an alleged violation by any of those individuals, the General Counsel (or the CEO, if the General Counsel is implicated) will be informed and will ensure an appropriate investigation and appropriate discipline for any violation.

65.    In the section, "Be Kind to Each Other," under the subsection "Avoid Conflicts of Interest," the Code of Conduct states:

We are a community of kind, smart, and creative people with a wide range of outside interests. It's our job to manage those outside interests responsibly and with respect for our commitment to the company. That means we avoid situations where what's best for us personally conflicts with what's best for Snap. When we all put Snap first, we build trust and honor the work and efforts of our colleagues. By contrast, when we introduce conflicts of interest, we undermine trust and we put each other in uncomfortable positions.

How We Are Kind

• We put Snap's interests first.

• We avoid situations where our outside interests, relationships, or activities prevent us from making good decisions for Snap, or give the appearance that we are unable to carry out our jobs effectively. We never take Snap's business opportunities for our own personal gain.

• We avoid situations where our outside interests put pressure on our colleagues to make decisions that aren't in Snap's best interests.

• We disclose any outside employment and qualifying projects, relationships, investments, and potential Snap corporate or business opportunities through Snap's Conflicts of Interest disclosure tool, making sure to also inform our manager.

• We avoid accepting any gifts or courtesies — whether from third parties or Snap team members — that prevent us from making neutral decisions in

20

Verified Shareholder Derivative Complaint

Snap's best interests, and we follow Snap's Gifts, Meals, Entertainment, & Third Party Travel Policy.

• We respect and follow Snap's policies regarding our outside activities and the responses the company provides when we disclose them. We recognize that in some cases that may mean stopping those activities altogether if we wish to stay employed at Snap.

66.    In the section, "Be Kind to Our Investors," under the subsection "Keep Accurate Records and Contracts," the Code of Conduct states:

Our commitment to honesty is reflected in how we keep business records. Those records come in all shapes and sizes, from receipts to contracts to our user engagement metrics and published financials. Whatever the type of record, we apply the same approach: we are truthful, transparent, and accurate in our documentation. That's the kind of company that investors and the public can trust.

How We Are Kind

• We record all business activities accurately and honestly. We do not engage in any activities that would cause those records to be misleading.

• We respect and follow Snap's contracting process. We make sure our contracts accurately portray the agreement and capture all terms of the deal. We don't enter into "side agreements."

• We respect Snap's procurement process and make sure we have the necessary authorization before entering into any agreements or agreeing to any terms on Snap's behalf.

• We always record user engagement metrics, partner metrics, and financial data accurately. We never knowingly falsify, misstate, mischaracterize, or otherwise inaccurately represent those metrics or financials.

• We immediately notify Risk Advisory Partners (RAP) or Integrity & Compliance if we learn of anything that might cause inaccuracies in our public filings or statements.

Verified Shareholder Derivative Complaint

67.   In the same section, under the subsection, "Make Truthful and Accurate Public Statements," the Code of Conduct states, in relevant part:

Investors, Customers, and Partners need to trust what we say because they make financial and business decisions based on our disclosures. We take that trust seriously and avoid making misleading public statements, particularly those related to our finances, user engagement metrics, and any other data about the company. Likewise, we are truthful and honest when communicating with third parties about our business.

How We Are Kind

• We prepare complete, timely, and accurate financial reports.

• We understand that only designated spokespeople are authorized to make public statements on Snap's behalf. We direct any press or other public inquiries to our Communications team. Snap team members follow public speaking guidelines and seek approval for appropriate opportunities.

• When we communicate with third parties, we always give honest and accurate information about our business. Our designated spokespeople follow our corporate disclosure rules.

• We do not misstate, mischaracterize, or otherwise inaccurately represent Snap data. We follow the company's data review and approval processes before releasing any data externally. (See Related Policies sidebar links.)

• We ensure any research we publish is truthful and accurate, and does not disclose confidential information.

• We disclose a wider range of issues related to our social impact through our yearly CitizenSnap Report and our Diversity Annual Report.

68.   In the same section, under the subsection "Don't Trade on Inside Information," the Code of Conduct states:

We respect our outside investors and want them to feel confident investing in our business. That's why we educate our team members to never put investors at a disadvantage by unfairly trading on our inside knowledge of Snap. Insider

Verified Shareholder Derivative Complaint

trading is not only illegal, but also it violates the trust of our investors and the public.

How We Are Kind

• We respect all laws banning insider trading. Under those laws, we instruct our team members not to trade based on "material non-public information" (i.e., information that a reasonable investor doesn't have, but would find important).

• We instruct our team members not to trade during the closed trading windows before our quarterly earnings releases.

• We instruct our team members not to give anyone "tips" about material non-public information or suggest that they make trades based on our inside knowledge.

69.     In the same section, under the subsection "Respect Snap's Property," the Code of Conduct states:

We also demonstrate our integrity by respecting Snap's property. That property is meant to benefit our investors and other stakeholders, not us personally. We are responsible and honest when handling and protecting Snap's property, including money, corporate information, physical property and goods, intellectual property, and other belongings.

We also respect the property of individuals, such as team members and suppliers, consistent with our shared commitment to being kind.

How We Are Kind

• We never take Snap's property for our personal benefit.

• We spend Snap's money wisely and use its resources carefully. For example, we make sure that any expenses are reasonable, tied to a business purpose, and compliant with Snap's policies.

• We understand that business communications and data belong to Snap and should only be accessed and reviewed according to our internal policies.

Verified Shareholder Derivative Complaint

• We respect the intellectual property of our partners and other third parties. For example, we never copy protected materials or otherwise take or use third-party intellectual property — such as code, images, text, or other creative works — without authorization or legal justification.

• We report questions or concerns regarding the protection of Snap's property and/or personal property to Global Security or Integrity & Compliance.

70. In the same section, under the subsection "Keep Confidential Information Confidential," the Code of Conduct states:

Snap's continuing product leadership relies on our ability to out-innovate our competitors and surprise our community with terrific experiences. That means confidentiality — about our projects, our products, non-public financial metrics, and any other private information — is critical. We treat the confidential information of third parties with the same respect.

How We Are Kind

• We treat all of Snap's non-public information as confidential and we don't disclose it to anyone outside the company without the appropriate authorization. As part of this commitment, we never take Snap's non-public information outside of Snap's IT environment without a valid business reason. We also never expose Snap's non-public information to any AI tool that is not otherwise approved under Snap's Policy on Generative AI Use. We understand that nonpublic information includes a wide variety of information, such as marketing plans, customer information, financial information, metrics, and internal reports and emails.

• We never hold confidential conversations within earshot of the public or in public places like restaurants — this is one of the reasons why our Food team provides in-office meals. And even inside the office, we only disclose and discuss confidential information on a need-to-know basis.

• We respect the confidentiality of our partners and other third parties, and we never disclose their confidential information without authorization.

• We do not use confidential information of Snap or our partners or other third parties for personal gain.

Verified Shareholder Derivative Complaint

• We report questions or concerns regarding the protection of confidential information to Global Security or Integrity & Compliance.

71.     In the section "Be Kind to Our World," under the subsection "Respect Laws," the Code of Conduct states:

Our global corporate citizenship begins by respecting the laws of the places where we operate.

How We Are Kind

• We follow all applicable governmental laws, rules, and regulations.

• We pay appropriate tax to the countries and localities where we operate. We view tax not just as a legal obligation but as a way to support those communities. Ensuring that we pay the right amount of tax, at the right time, and in the right place is a critical part of our approach.

• If we are ever confused about what the law requires, or think something we or someone else is doing may be violating the law, we reach out to Integrity & Compliance for guidance.

• We have a zero tolerance approach to the facilitation of tax evasion by Snap, our team members, or anyone acting on our behalf. Any concerns regarding potential tax evasion should be reported immediately.

72.     In the section "Violations, Waivers, & Modifications," the Code of Conduct states:

Violations of this Code may result in disciplinary action up to and including termination of employment, at the sole discretion of the Company or Board.

The Board of Directors or a delegated board committee must approve:

• Any substantive modification of this Code

• Waivers of any part of this Code for Executive Officers or members of the Board of Directors. All such waivers must be publicly disclosed by publication on the Snap website or by filing a current report on SEC Form 8-

K pursuant to applicable SEC and stock exchange rules.

73.     In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including but not limited to, breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, violations of the Exchange Act, and unjust enrichment, including Defendant Andersen who sold Company stock on inside information. Also, in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Snap's records and reports, failed to maintain internal controls, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## SNAP'S AUDIT COMMITTEE CHARTER

74.     The Company also maintains an Audit Committee Charter (the "Audit Committee Charter"). The Audit Committee Charter states the purpose of the Audit Committee as:

The purpose of the Audit Committee of Snap Inc. is to:

 ● help the Board of Directors oversee Snap's corporate accounting and financial reporting processes, systems of internal control, and financial statement audits;

● manage the selection, engagement terms, fees, qualifications, independence, and performance of the registered public accounting firms engaged as Snap's independent outside auditors for the purpose of preparing or issuing an audit report or performing any services;

● review any reports or disclosures required by applicable rules and regulations of the Securities and Exchange Commission (the "SEC") and any applicable stock exchange;

● oversee certain risk exposures and to assist the Board in fulfilling its oversight responsibilities relating to risk assessment and management;

26
Verified Shareholder Derivative Complaint

● oversee the organization and performance of Snap's internal audit function; and

● provide regular reports and information to the Board with respect to material issues.

The Audit Committee will maintain and foster an open avenue of communication with Snap management, internal auditors, and independent auditors. It will also be responsible for any additional duties and responsibilities that the Board mandates.

75.    In the section "Responsibilities," the Audit Committee Charter states the responsibilities of the Audit Committee as:

The Audit Committee will oversee Snap's financial reporting process on behalf of the Board. The independent auditors and any other registered public accounting firm engaged for the financial reporting process will report directly to the Audit Committee and be accountable to it. The Audit Committee's responsibilities are a guide and should remain flexible to account for changing circumstances and needs. The Audit Committee may supplement its duties as appropriate and establish policies and procedures consistent with applicable rules and regulations.

76.    In the same section, under the subheading "Financial Review and Disclosure:" the Audit Committee Charter states the responsibilities of the Audit Committee as:

6. **Audited Financial Statement Review; Quarterly and Annual Reports.** The Audit Committee will review the annual audited financial statements and quarterly financial statements with Snap management and the independent auditors. The Audit Committee will be responsible for recommending to the Board whether the proposed annual audited financial statements should be included in Snap's Annual Report on Form 10-K.

7. **Earnings Announcements**. The Audit Committee will review and discuss with Snap management and the independent auditors any earnings press releases and other financial information regarding Snap's results of operations.

Verified Shareholder Derivative Complaint

8. **Proxy Report.** The Audit Committee will oversee the preparation of any report required by applicable rules and regulations to be included in any Snap proxy statement.

9. **Accounting Principles and Policies.** The Audit Committee will review and discuss with Snap management and the independent auditors significant issues regarding accounting principles and financial-statement presentation, including:

● critical accounting policies and practices;
● alternative accounting policies available under GAAP;
● the potential impact on Snap's financial statements of alternative treatments; and
● any other significant reporting issues and judgments, significant regulatory, legal, and accounting initiatives, or developments that may have a material impact on Snap's financial statements, compliance programs, and policies.

The Audit Committee will review with the independent auditors and Snap management, if appropriate, any written communication, such as any management letter or internal-control 3. letter, before the independent auditors issue it and before management responds to the communication.

10. **Management Cooperation with Audit.** The Audit Committee will evaluate Snap management's cooperation with the independent auditors during their audit examination, including any significant difficulties or disagreements encountered during the audit, if any. The Audit Committee will resolve any conflicts or disagreements regarding financial reporting.

(Emphasis in original).

77.    In the same section, under the subheading "Internal Controls:" the Audit Committee Charter states the responsibilities of the Audit Committee as:

● **Risk Assessment and Management.** The Audit Committee will review and discuss with Snap management and the independent auditors Snap's policies on financial risk management and assessment. The Audit Committee will provide regular reports to the Board about material issues affecting the quality or integrity of Snap's financial statements, compliance with legal or regulatory requirements, the performance or independence of the independent auditors, the performance of Snap's internal audit function, and other matters as the Audit Committee deems appropriate.

28

Verified Shareholder Derivative Complaint

● **Internal Auditors.** The Audit Committee will review the audit plan of Snap's internal auditor and discuss with that team the adequacy and effectiveness of Snap's scope, staffing, and general audit approach. The Audit Committee will review any significant reports prepared by Snap's internal auditors, as well as management's response. The head of Snap's internal auditors will also report to and be evaluated by the Audit Committee.

● **Internal Control over Financial Reporting; Disclosure Controls.** The Audit Committee will confer with Snap management and the independent auditors concerning the scope, design, adequacy, and effectiveness of internal control over financial reporting and Snap's disclosure controls and procedures. The Audit Committee will review reports on significant findings and recommendations with respect to internal controls over financial reporting, together with management responses and any special audit steps adopted in light of any material control deficiencies. Periodically, the Audit Committee will meet in separate sessions with the independent auditors, Snap's internal auditors, and Snap management to discuss any matters that any of these parties believe should be discussed privately with the Audit Committee.

● **Correspondence with Regulators.** The Audit Committee will consider and review with Snap management, the independent auditors, and outside advisors or accountants any correspondence with regulators or governmental agencies and any published reports that raise material issues regarding Snap's financial statements or accounting policies.

● **Internal Control Report.** At least annually, the Audit Committee will review a report by the independent auditors describing any material issues raised by (i) that firm's internal quality-control review, (ii) any peer review of the firm's internal quality control review, or (iii) any inquiry or investigation by governmental or professional authorities conducted in the last five years of any audit performed by the independent auditors. As part of this annual review, the independent auditors' report will also describe any steps taken to address the issues raised.

● **Complaint Procedures.** The Audit Committee is responsible for overseeing procedures for receiving, retaining, and investigating:

o complaints received by Snap regarding accounting, internal accounting controls, or auditing matters; and

Verified Shareholder Derivative Complaint

o confidential and anonymous submissions by employees concerning questionable accounting or auditing matters.

● **Ethical Compliance.** The Audit Committee will review the results of management's efforts to monitor compliance with Snap's programs and policies adhering to applicable laws and rules, including Snap's Code of Conduct.

● **Related Party Transactions.** The Audit Committee will review and approve, in accordance with Snap's policies, any related party transaction as defined by applicable rules and regulations.

(Emphasis in original).

78.    In the section "Other Matters:" the Audit Committee Charter states the Audit Committees responsibilities as:

● **Annual Audit Committee Evaluation.** The Audit Committee will annually evaluate its performance and the adequacy of this charter.

● **Other Legal and Finance Matters.** The Audit Committee will review with Snap management legal and regulatory compliance and any actual, pending, or threatened legal or financial matters that could significantly affect Snap's business or financial statements.

The Committee's responsibility is one of oversight. The members of the Audit Committee are not Snap employees, and they do not perform management's or any independent auditors' functions. The Audit Committee relies on the expertise and knowledge of management, the internal auditors, and any independent auditors in carrying out its oversight responsibilities. Snap management is responsible for preparing accurate and complete financial statements in 5. accordance with GAAP, crafting periodic reports, and establishing and maintaining appropriate accounting principles and financial reporting policies and satisfactory internal control over financial reporting. The independent auditors will audit Snap's annual consolidated financial statements and the effectiveness of Snap's internal control over financial reporting and review Snap's quarterly financial statements. It is not the Audit Committee's responsibility to prepare or certify Snap's financial statements, guarantee the audits or reports of the independent auditors, certify as to whether any independent auditors are "independent" under applicable rules, or ensure that the financial statements or periodic reports are complete and

accurate, conform to GAAP, or otherwise comply with applicable laws and Snap's policies.

(Emphasis in original).

79. In violation of the Audit Committee Charter, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

80. Snap operates the visual messaging platform called Snapchat, which "empowers people to express themselves, live in the moment, learn about the world, and have fun together. It's the easiest and fastest way to communicate the full range of human emotions with your friends without pressure to be popular, pretty, or perfect."

81. The Snapchat platform connects brand and direct response advertisers to customers in a variety of ways including different ad types, integrations, and locations. Advertisers participate in a dynamic, real-time auction system in order to provide advertisements to customers on Snapchat. The system works by placing bids on available inventory, thereby allowing clients to participate in advertising auctions in the little time it otherwise would take a digital advertisement to load. Snapchat's advertisement auction system utilizes Goal-Based Bidding in order to conduct its auctions, which lets the advertiser tell Snap what its goals are, such as app installs, website visits, or video views,

Verified Shareholder Derivative Complaint

and Snapchat's advertisement auction system then optimizes the advertiser's bids within the auction system to meet the advertiser's stated goals.

82.    When an advertiser participates in Snapchat's auction system, the advertiser will set the maximum amount they would be willing to pay for their desired goal. Snapchat automatically sets the advertiser's bids for the lowest cost per goal. Snapchat will then predict an Estimated Action Rate for the advertiser bids, which is the likelihood that a specific user, if shown the advertiser's advertisement, will take the desired action. The winner of a specific auction is not necessarily reserved for the highest bidder, instead Snapchat will factor in the advertisement quality, the Estimated Action Rate, and the bid amount in order to determine the winning bid, which Snapchat calls an "effective bid."

**False and Misleading Statements**

*April 29, 2025 Earnings Call*

83.    On April 29, 2025, Snap held the 1Q 2025 Earnings Call. Defendant Spiegel touted Snap's advertising growth in the first quarter, stating, in relevant part:

> In Q1, our community grew to 460 million daily active users, an increase of 38 million year-over-year, and content viewers and total time spent watching content grew year-over-year. Q1 revenue increased 14% year-over-year to $1.36 billion, driven by the progress we have made with our direct response advertising solutions, continued momentum in driving performance for small and medium-sized businesses and the growth of our Snapchat+ subscription business. The benefits of our more focused investments are now evident in our improved profitability and free cash flow generation.
>
> . . .
>
> Given the progress we have made with our advertising platform, and the pace of execution against our 2025 strategic priorities, we believe we are well positioned to deliver improved business performance and meaningful positive free cash flow as we make further progress towards GAAP profitability.

84.    Later in the 1Q 2025 Earnings Call, Defendant Andersen broke down the Company's first quarter financial results and provided broad expectations for Snap's advertising platform for future quarters, stating:

Verified Shareholder Derivative Complaint

In Q1, total revenue was $1.363 billion, up 14% year-over-year, and up 15% year-over-year on a constant currency basis. Advertising revenue was $1.211 billion, up 9% year-over-year, driven primarily by growth from DR advertising revenue, which increased 14% year-over-year.

Brand-oriented advertising revenue was down 3% year-over-year due to a combination of softness in upper funnel demand across all regions, as well as the ongoing shift in the mix of our advertising business toward performance-oriented advertising solutions. This mix shift is evident in the fact that direct response advertising revenue contributed 75% of our total advertising revenue for the first time in Q1.

. . .

North America revenue growth accelerated to 12% year-over-year in Q1, up from 8% in the prior quarter. With a faster growth rate in Q1, driven primarily by a higher rate of Direct Response advertising revenue growth. Europe revenue grew 14% year-over-year, and Rest of World revenue grew 20% year-over-year, with softer brand-oriented advertising demand in these regions, partially offsetting continued strong growth in Direct Response advertising revenue, and continued momentum in the SMB customer segment, in particular, in these regions.

85.    Defendant Andersen continued, providing management's broad expectations for the upcoming quarter, stating in relevant part:

Given the uncertainty with respect to how macroeconomic conditions may evolve in the months ahead, and how this may impact advertising demand more broadly, we do not intend to share formal financial guidance for Q2. *While our top line revenue has continued to grow, we have experienced headwinds to start the current quarter, and we believe it is prudent to continue to balance our level of investment with realized revenue growth*. As a result, we are updating our full year cost structure guidance to reflect our current investment plans.

. . .

*While there is uncertainty regarding the macro operating environment, we remain optimistic about the long-term prospects for our business*. We

33

Verified Shareholder Derivative Complaint

remain optimistic because of the progress we have made with our ad platform to improve performance for our advertising partners, because of the progress we have made to diversify our advertiser base as well as our revenue sources with the growth of Snapchat+. *Because of our demonstrated ability to prioritize our cost structure to balance investment with top line growth over time*, and because we have built a strong balance sheet with the financial flexibility necessary to maintain strategic focus through volatile macro conditions.

Moving forward, we will remain focused on executing against our strategic priorities of growing our community and improving depth of engagement, driving top line revenue growth and diversifying our revenue sources, and building toward our long-term vision for augmented reality.

86.    The question-and-answer portion of the 1Q 2025 Earnings Call included the following exchange between an analyst and Defendant Andersen:

Analyst: Great. I got to ask the obligatory macro question. So I think everybody is curious what you guys are seeing thus far here in the second quarter on both brand and DR. It sounds like you're growing, but you're starting to see some impact. So I guess, could you just give us a little more color on what categories or what segments of the business are seeing an impact?

. . .

Defendant Andersen: . . . At a high level, the macro is changing quickly. And I think the path we're concerned here going forward is an entirely clear that obviously impacts visibility on our end. We've learned from some of the big past macro events that we experienced in external events to be thoughtful about how this can impact the operating environment and therefore, our approach to guidance generally.

We've had a really solid Q1 top line growth at the very high end of our guide range and then both adjusted EBITDA and net income well above those ranges. So we started the year really strong. *Thus far in Q2, we're still growing. But we've seen some headwinds to our top line growth so far.*

As one example, we've heard from a subset of advertisers that their spending has been impacted by the changes to the de minimis exemption. However, I caution here, it's just really difficult to parse the drivers between the various

Verified Shareholder Derivative Complaint

potential factors there. *We're just really focused on continuing to execute for our customers and to build on the momentum we saw in Q1 with active advertisers up to 60%, DR advertising revenue reaching 70% of total ad revenue for the first time.*

87. The question-and-answer portion of the 1Q 2025 Earnings Call also included the following exchange between an analyst and Defendants Spiegel and Andersen regarding Snap's advertisement platform:

Analyst: I guess one of the big questions that everyone is trying to understand, you've been sort of in that mid-teens-ish, low to mid-teens-ish growth rate for Direct Response advertising. The comp was definitely harder this quarter than it's been in a long time. But I think as you sort of look at the investments you've been making, the rollout of new products like Sponsored Snaps, what will it take to deliver 20-plus percent growth in the DR business?

Like do you have line of sight to like what needs to happen or how long it will take to sort of get that to be a 20-plus percent growth business? And then just 2 housekeeping things, Derek. One of the de minimis that you just mentioned, anything that you could say in terms of how much China-based advertisers is a percentage of your revenue?

And on the guidance comment, the forward-looking that April is continuing to grow, I've gotten a lot of questions. Is advertising growing? Or is it -- if you look -- excluding Snap+, is it still growing, excluding Snap+, as you look into April because everyone is trying to isolate what's happening in core ad business given everything that's happened with tariffs?

Defendant Spiegel: Yes. We're really excited about the progress we've been making on the Direct Response business over the past couple of years, we've really invested heavily there. I think -- just thinking big picture in terms of the contributors to accelerating to 20% from, I think, about 14% we're at today. *Of course, we're going to continue the ongoing ad platform improvements. We've mentioned on the call, including larger and fresher models and better signal utilization.*

*I think in terms of the product road map and the product pieces, we've got a really good road map for our app goal-based bidding objectives, and for dynamic product ads as well that will land throughout the year.* And then I

35

Verified Shareholder Derivative Complaint

think bringing Direct Response goal-based bidding objectives to new placements like Sponsored Snaps will also be a contributing factor as well.

. . .

Defendant Andersen: . . . On the China-based advertisers, we don't really break it down at that level of detail. We've not previously disclosed that market as a breakout market in our Qs and Ks. So in some ways, that perhaps is helpful in and of itself.

***And look, we're early in the quarter. We're only a few weeks in. You were [sic] continuing to grow as a business, but we've seen some headwinds thus far. I think it's early.*** And of course, there's a lot of quarter ahead of us and the macro uncertainty and how that's going to evolve over time. So we're going to keep watching it and monitoring the growth of the business and go from there. So hopefully, that gives you a little bit more color on the China base side of things.

88.     Later in the question-and-answer portion of the 1Q 2025 Earnings Call, in an exchange between an analyst and Defendant Andersen, Defendant Andersen further detailed the possible second quarter headwinds, stating:

Analyst: Maybe first, you could talk a little bit about the kind of progression through the first quarter on the ad side. And as you go into April, any particular categories that you're seeing, or geographies that you're seeing changes in performance? Maybe we'll start there and 1 follow-up after that.

Defendant Anderson: . . . ***In terms of what we're seeing early here in the new quarter, we're just a few weeks in. It's very early in the going. As I said earlier, the business is continuing to grow, but we have seen some headwinds to start the quarter to the growth rate.*** As I mentioned earlier, one example of a factor that we've seen as a driver there is some advertisers that have been impacted by the changes to the de minimis exemption. But as I also said earlier, it's really difficult, this early in the going, to parse the different drivers that can be impacting that. ***So we're going to continue to watch it really carefully***. And of course, where we head from here on the macro and some of the factors there is also uncertain.

***So the key is that we stay focused on executing for our customers, improving the ad platform*** and that we continue to be thoughtful about balancing our

36

Verified Shareholder Derivative Complaint

investment levels over time to make progress for the business financially. So hopefully, that gives you a little bit more color on your question.

89. Later in the question-and-answer portion of the 1Q 2025 Earnings Call, Defendant Spiegel also discussed the possible second quarter headwinds in the following exchange:

Analyst: You mentioned hitting 900 million DAUs and that you're approaching 1 billion yet. North America DAUs contracted sequentially. I know you've been working on a number of initiatives to restimulate growth in North America. So curious to hear what is potentially not working? And what gives you confidence that those trends can inflect positively again?

Defendant Spiegel: . . . In North America, in particular, we sort of trended around this 100 million, 99 million DAU sort of number. ***We're not expecting further declines here in Q2 in North America. And the things that sort of make us confident or that we're excited about are really the engagement around snapping that is so core to the service***, people making and sending snaps with their friends. So we've seen some positive trends there. We're continuing to build on those overall and then continuing to invest in the content business as well.

90. The statements referenced in ¶¶ 83-89 above were materially false and misleading when made because they failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the identified statements failed to disclose that: (1) Snap's optimistic reports of its advertising growth rate and earnings potential relied too heavily on its ability to execute on its potential; (2) Snap was already experiencing the effect of the execution error in its auction bidding advertisement system when the Defendants' claimed a lack of visibility due to macroeconomic conditions; and (3) as a result, the Company's growth rate and earnings potential would fall short of the projected guidance. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

Verified Shareholder Derivative Complaint

**The Truth Emerges**

***August 5, 2025 Earnings Call***

91.     The truth emerged on August 5, 2025, when the Company released disappointing second quarter 2025 fiscal results. On the same day, the Company held the 2Q 2025 Earnings Call.  During the 2Q 2025 Earnings Call, Defendant Andersen clarified the Company's advertisement revenue only increased 4% year-over-year due to Snap's own failure in executing an update to its advertisement auction system:

> As our global community continues to grow, we have continued to scale our top line with total revenue reaching $1.345 billion in Q2 and up 9% year-over-year. Our rate of top line growth was impacted by a number of factors in Q2, ***including an issue related to our ad platform, the timing of Ramadan and the effects of the de minimis changes.*** Unfortunately, in our efforts to improve advertiser performance, ***we shipped a change that caused some campaigns to clear the auction at substantially reduced prices. We have since reverted this change and advertising revenue growth has improved as advertisers adjust their bid strategies to achieve their objectives.***
>
> Despite these headwinds, ***advertising revenue reached $1.174 billion in Q2, up 4% year-over-year,*** driven primarily by growth from DR advertising revenue, which increased 5% year-over-year.

92.     During the question-and-answer portion of the 2Q 2025 Earnings Call, Defendant Andersen elaborated on the error with Snap's advertising auction system:

> One of them certainly is the one you mentioned around the ad platform. We also had a factor around the timing of Ramadan, which was less of a benefit in Q2 than in the prior year. And as well, there was the impact of the de minimis changes in the quarter.
>
> . . .
>
> So if you recall, we grew ad revenue at a rate of approximately 9% in Q1. ***And what we saw in April is that ad revenue growth declined to approximately 1% before largely recovering as we move through May*** and what you saw ***in May is, number one, we've gone to the work of reverting the ad platform change***, but also the factor around Ramadan obviously being diminished during that period of time. So we saw the recoveries we went through May.

38

Verified Shareholder Derivative Complaint

. . .

So the big focus at this point is building demand we have seen post the rollback of the ad change as we moved through June and into July. We've seen ad revenue specifically growing at a rate between 3% to 4% *so give you a sense of how the topography sort of moved from 9% in Q1 to approximately 1% ad revenue in April than to a rate of recovering largely in May and then we're looking at 3% to 4% plus the roll back to that change.*

93.     On this news, the Company's stock price fell $1.61 per share, or approximately 17.2%, from a closing price of $9.38 per share on August 5, 2025, to close at $7.78 per share on August 6, 2025.

## REPURCHASES DURING THE RELEVANT PERIOD

94.     During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of approximately $33.3 million to repurchase approximately 4 million shares of its own common stock at artificially inflated prices from May 2025 through August 2025.

95.     According to the Form 10-Q for the second quarter of 2025 filed with the SEC on August 5, 2025, between May 1, 2025 and May 31, 2025, the Company repurchased 4,011,000 shares of its own common stock at an average price per share of approximately $8.29, for a total cost to the Company of approximately $33,251,190.

96.     As the Company's stock was actually worth only $7.73 per share, the price at closing on August 6, 2025, the Company overpaid by approximately $2,045,610 for repurchases of its own stock between May 1, 2025 and May 31, 2025.

97.     Thus, in total, during the Relevant Period, the Company overpaid for repurchases of its own stock by over $2 million.

## DAMAGES TO SNAP

98.     As a direct and proximate result of the Individual Defendants' conduct, Snap has lost and will continue to lose and expend many millions of dollars.

99.     Such expenditures include, but are not limited to, legal fees, costs, and any

Verified Shareholder Derivative Complaint

payments for resolution of or to satisfy a judgment associated with the Securities Class Actions, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

100. Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

101. Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

102. Such losses include the Company's overpayment of over $2 million for repurchases of its own stock during the period when the Company's stock price was artificially inflated due to the false and misleading statements discussed above.

103. Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

104. As a direct and proximate result of the Individual Defendants' conduct, Snap has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

105. Plaintiff brings this action derivatively and for the benefit of Snap to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as controlling shareholders, directors, and/or officers of Snap, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of the Exchange Act.

Verified Shareholder Derivative Complaint

106. Snap is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

107. Plaintiff is, and has been at all relevant times, a shareholder of Snap. Plaintiff will adequately and fairly represent the interests of Snap in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

108. Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

109. A pre-suit demand on the Board is futile and, therefore, excused. When this action was filed, Snap's Board consisted of the following eleven individuals: Defendants Spiegel, Coffey, Coles, Jenkins, Lanzone, Lynton, Miller, Murphy, Spence, Thorpe, and Vargas (the "Director-Defendants"). Plaintiff needs only to allege demand futility as to six of the eleven Director-Defendants that were on the Board at the time this action was filed.

110. Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact, while they caused the Company to repurchase its own stock at artificially inflated prices. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

111. In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Snap to issue materially false and misleading statements. Specifically, the Director-Defendants caused Snap to issue false and misleading statements which were intended to make Snap appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached

Verified Shareholder Derivative Complaint

their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

112. Additional reasons that demand on Defendant Spiegel is futile follow. Defendant Spiegel co-founded the Company and has served as the Company's CEO and as Company director since May 2012. Defendant Spiegel is also a controlling shareholder in the Company. The Company provides Defendant Spiegel with his principal occupation for which he receives handsome compensation. Thus, as the Company admits, he is a non-independent director. As the Company's highest officer, he conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein and personally made many of the false and misleading statements alleged herein. Further, Defendant Spiegel is a defendant in the Securities Class Actions. For these reasons, too, Defendant Spiegel breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

113. Additional reasons that demand on Defendant Coffey is futile follow. Defendant Coffey has served as a Company director since May 2020. She also serves as a member of the Audit Committee. As a trusted, long-time Company director, she conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Coffey breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

114. Additional reasons that demand on Defendant Coles is futile follow.

Verified Shareholder Derivative Complaint

Defendant Coles has served as a Company director since December 2015. She is also the Chair of the Nominating and Corporate Governance Committee. As a trusted, long-time Company director, she conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Coles breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

115. Additional reasons that demand on Defendant Jenkins is futile follow. Defendant Jenkins has served as a Company director since December 2020. She also serves as the Chair of the Audit Committee. As a trusted, long-time Company director, she conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Jenkins breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

116. Additional reasons that demand on Defendant Lanzone is futile follow. Defendant Lanzone has served as a Company director since September 2024. He also serves as a member of the Nominating and Corporate Governance Committee. As a trusted, long-time Company director he conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Lanzone breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is

Verified Shareholder Derivative Complaint

futile and, therefore, excused.

117. Additional reasons that demand on Defendant Lynton is futile follow. Defendant Lynton has served as a Company director since April 2013 and as Chairperson of the Board since September 2016. He also serves as the Chair of the Compensation Committee, a member of Audit Committee, and as a member of the Nominating and Corporate Governance Committee. As a trusted, long-time Company director, he conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Lynton breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

118. Additional reasons that demand on Defendant Miller is futile follow. Defendant Miller has served as a Company director since October 2016. He also serves as a member of the Audit Committee and as a member of the Compensation Committee. As a trusted, long-time Company director, he conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Miller breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

119. Additional reasons that demand on Defendant Murphy is futile follow. Defendant Murphy co-founded the Company and has served as the Company's CTO and as a Company director since May 2012. Defendant Murphy is also a controlling shareholder. The Company provides Defendant Murphy with his principal occupation for which he receives handsome compensation. Thus, as the Company admits, he is a non-

Verified Shareholder Derivative Complaint

independent director. As a trusted, long-time Company director, he conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Murphy breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

120. Additional reasons that demand on Defendant Spence is futile follow. Defendant Spence has served as a Company director since September 2023. He also serves as a member of the Compensation Committee. As a trusted, long-time Company director, he conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Spence breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

121. Additional reasons that demand on Defendant Thorpe is futile follow. Defendant Thorpe has served as a Company director since August 2018. She also serves as a member of the Audit Committee and as a member of the Compensation Committee. As a trusted, long-time Company director, she conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Thorpe breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused

122. Additional reasons that demand on Defendant Vargas is futile follow.

Verified Shareholder Derivative Complaint

Defendant Vargas has served as a Company director since July 2021. He also serves as a member of the Nominating and Corporate Governance Committee. As a trusted, long-time Company director, he conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Vargas breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

123. Additional reasons that demand on the Board is futile follow.

124. Defendants Jenkins (as Chair), Coffey, Lynton, Miller, and Thorpe served as members of the Audit Committee at all relevant times (collectively, the "Audit Committee Defendants"). As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, the Audit Committee Defendants violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Code of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

125. In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust

enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In further violation of the Code of Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

126. Snap has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or any others who were responsible for that wrongful conduct to attempt to recover for Snap any part of the damages Snap suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

127. The Director-Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

128. The acts complained of herein constitute violations of fiduciary duties owed by Snap's officers and directors, and these acts are incapable of ratification.

129. The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Snap. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it

Verified Shareholder Derivative Complaint

may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Snap, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

130.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Snap to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

131.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least six of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
### Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Exchange Act

132.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

133.    The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Snap. Not only is Snap now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Snap by the Individual Defendants. With the price of its common stock trading at artificially inflated prices due to the Individual Defendants' misconduct, the Individual

Verified Shareholder Derivative Complaint

Defendants caused the Company to repurchase *4,011,000* of its own shares at artificially inflated prices, damaging Snap.

134.   During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in earnings calls, and periodic and current reports filed with the SEC.

135.   The Individual Defendants employed devices, schemes, and artifices to defraud while in the possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Snap not misleading.

136.   The Individual Defendants as top executives acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

137.   By virtue of the foregoing, the Individual Defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

## SECOND CLAIM
### Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act

138.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

Verified Shareholder Derivative Complaint

139.   The Individual Defendants, by virtue of their positions with Snap and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Snap and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of §20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Snap to engage in the illegal conduct and practices complained of herein.

140.   Plaintiff, on behalf of Snap, has no adequate remedy at law.

### THIRD CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duties

141.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

142.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Snap's business and affairs.

143.   Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

144.   The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Snap.

145.   In breach of their fiduciary duties owed to Snap, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) Snap's optimistic reports of its advertising growth rate and earnings potential relied too heavily on its ability to execute on its potential; (2) Snap was already experiencing the effect of the execution error in its auction bidding advertisement system when the Defendants' claimed a lack of visibility due to macroeconomic conditions; and (3) as a

result, the Company's growth rate and earnings potential would fall short of the projected guidance. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

146.   In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

147.   Also, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

148.   In yet further breach of their fiduciary duties, during the Relevant Period, the Individual Defendants willfully or recklessly caused the Company to repurchase thousands of shares of its own common stock at artificially inflated prices before the fraud was exposed, while one of the Individual Defendants engaged in lucrative insider sales, netting proceeds of approximately $2.7 million.

149.   The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Snap's securities.

150.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they

caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Snap's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

151.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

152.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Snap has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

153.   Plaintiff, on behalf of Snap, has no adequate remedy at law.

## FOURTH CLAIM
### Against the Individual Defendants for Unjust Enrichment

154.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

155.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Snap.

156.   The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Snap that was tied to the performance or artificially inflated valuation of Snap, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

157.   Plaintiff, as a shareholder and a representative of Snap, seeks restitution from

Verified Shareholder Derivative Complaint

the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

158.   Plaintiff, on behalf of Snap, has no adequate remedy at law.

## FIFTH CLAIM
### Against the Individual Defendants for Abuse of Control

159.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

160.   The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Snap, for which they are legally responsible.

161.   As a direct and proximate result of the Individual Defendants' abuse of control, Snap has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

162.   Plaintiff, on behalf of Snap, has no adequate remedy at law.

## SIXTH CLAIM
### Against the Individual Defendants for Gross Mismanagement

163.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

164.   By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Snap in a manner consistent with the operations of a publicly held corporation.

165.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Snap has sustained and will continue to sustain significant damages.

Verified Shareholder Derivative Complaint

166. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

167. Plaintiff, on behalf of Snap, has no adequate remedy at law.

## SEVENTH CLAIM
### Against Individual Defendants for Waste of Corporate Assets

168. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

169. The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

170. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Snap to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

171. In addition, the Individual Defendants caused the Company to repurchase shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

172. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

173. Plaintiff, on behalf of Snap, has no adequate remedy at law.

## EIGHTH CLAIM
### Against Defendants Spiegel and Andersen for Contribution Under Sections 10(b) and 21D of the Exchange Act

174. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

175. Snap and Defendants Spiegel and Andersen are named as defendants in the

Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendant Spiegel's and Defendant Andersen's willful and/or reckless violations of their obligations as officers and/or directors of the Company.

176. Defendants Spiegel and Andersen, because of their positions of control and authority as officers and/or directors of the Company, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

177. Accordingly, Defendants Spiegel and Andersen are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

178. As such, Snap is entitled to receive all appropriate contribution or indemnification from Defendants Spiegel and Andersen.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of Snap, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Snap;

(c)     Determining and awarding to Snap the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Snap and the Individual Defendants to take all necessary

actions to reform and improve Snap's corporate governance and internal procedures to comply with applicable laws and to protect Snap and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws and/or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of Snap to nominate at least six candidates for election to the Board;

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e)   Awarding Snap restitution from Individual Defendants, and each of them;

(f)   Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)   Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.


Dated: September 2, 2025                    Respectfully submitted,

                                            **THE BROWN LAW FIRM, P.C.**

                                            */s/*Robert C. Moest_____
                                            Robert C. Moest, Of Counsel
                                            *Counsel for Plaintiff*

Verified Shareholder Derivative Complaint

Docusign Envelope ID: 013C60C4-8689-408E-B174-F5BED9EBF31D

## **VERIFICATION**

I, Alan Moisio, am a plaintiff in the within action.  I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 2__ day of __September__, 2025.

DocuSigned by:

B7E669230A7141C...

Alan Moisio